**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

RICKIE GREEN                                                                            PLAINTIFF
ADC #117055

v.                                          No: 5:17-cv-00074 JLH-PSH

DANNY BURL, *et al.*                                                          DEFENDANTS

## FINDINGS AND RECOMMENDATION

## INSTRUCTIONS

The following proposed Findings and Recommendation has been sent to United States District Judge J. Leon Holmes. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

## DISPOSITION

### I. Introduction

Plaintiff Rickie Green filed a complaint pursuant to 42 U.S.C. § 1983 on March 21, 2017, alleging that defendants were deliberately indifferent to his medical needs. Doc. No. 2. Green sues Danny Burl, Juan Burns, Richard Clark, Lemarcus Davis, Aundrea Fitzgerald, Eva S. Jensen, Darnzell Miller, Carl E. Stout, Cedric Moore, and Jeremy Ridgle (the "ADC Defendants") as well as Williams Benton, Erica Johnson, Estella Bland, and Ashley Mabry (the "Medical Defendants"). *Id.* The Court previously dismissed Green's claims against the Medical Defendants, Danny Burl, Aundrea Fitzgerald, Eva S. Jensen, and Carl E. Stout for failure to exhaust administrative remedies.

*See* Doc. Nos. 57, 67, 105 & 107.  The remaining defendants are Juan Burns, Richard Clark, Lemarcus Davis, Darnzell Miller, Cedric Moore, and Jeremy Ridgle.  Green's official capacity claims for money damages against these defendants were previously dismissed as barred by the doctrine of sovereign immunity.  *See* Doc. No.  54 & 60.

Green alleges that he was diagnosed with a knee and leg condition while incarcerated at the Arkansas Department of Correction's (ADC) North Central Unit in May 2016.  Doc. No. 2 at 6.  Green claims that after his transfer to the Tucker Maximum Security Unit, the classification committee removed his medical restrictions related to this condition, and gave him a job assignment.  *Id.*  Green's claims against the remaining defendants arise from his work assignment.  Those claims are:  (1) that defendants Burns and Miller forced him to work even after he stated he had a no-duty or "lay-in" prescription on September 15, 2016;[1] (2) that Burns required him to work on September 26, 2016, despite being on a "lay-in" list, and that defendants Moore and Ridgle watched him fall while on work duty that day and did not help him; and (3) that Clark and Davis took Green's crutches away during chow hall, forcing him to walk on his injured leg to get his crutches.  Doc. No. 105 at 12.

The defendants filed a motion for summary judgment, a brief in support, and a statement of facts asserting that they are entitled to summary judgment with respect to Green's claims (Doc. Nos. 150-152).  Green filed a response (Doc. No. 76).  For the reasons described herein, the undersigned recommends that defendants' motions for summary judgment be granted.

---

[1] The Court's Proposed Findings and Partial Recommendation entered on May 24, 2018, mistakenly indicated that this incident occurred on September 16, 2016, instead of September 15, 2016. *See* Doc. No. 105 at 12.  Grievance No. MX-16-2208 was filed on September 16, 2016, regarding the incident that occurred on September 15, 2016.  *See id.* at 8.

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986). When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted). An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .". Fed. R. Civ. P. 56(c)(1)(A). A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

### III. Facts

The facts listed below are taken from those submitted by defendants as supported by: the declaration of Aundrea Culclager (Doc. No. 150-1); a portion of Green's deposition testimony (Doc. No. 150-2); the declaration of Cynthia Gaines (Doc. No. 150-3); and the declaration of William Benton (Doc. No. 150-4). At the Court's request, defendants filed a complete transcript of Green's deposition testimony (Doc. No. 160).

In a conclusory two-page response, Green does not dispute the specific facts asserted by defendants but generally alleges that defendants were deliberately indifferent to his medical condition. Green submitted with his response a copy of the ADC's employment conduct standards, a copy of the ADC's employee handbook, and a copy of his health restrictions.[2] Because Green's response does not specifically controvert the facts set forth in defendants' statement of undisputed facts, Doc. No. 152, those facts are deemed admitted. *See* Local Rule 56.1(c).

#### *September 15, 2016*

Green was assigned to field utility in September 2016. Doc. No. 150-1 at 1. His primary job duties were cutting vegetation around the unit and harvesting crops in the unit's garden. *Id.* Inmates working field utility usually report to work between 6:00 a.m. and 7:00 a.m. *Id.* at 2. According to Culclager's affidavit, each unit maintains what is known as a "lay-in" list for work assignments. *Id.* at 1. This list informs ADC staff who is exempt from work on a given day. *Id.* An inmate may be placed on the lay-in list for a variety of reasons such as medical exemptions,

---

[2] Green does not explain why he attaches these documents. To the extent he attempts to show a violation of prison policy, that is insufficient to state a constitutional claim. *See Phillips v. Norris,* 320 F.3d 844, 847 (8th Cir. 2003); *Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997). Further, his health restrictions show that on September 10, 2016, he was given the following restriction: "Restrict from assignment requiring prolonged crawling, stooping, running, jumping, walking, or standing, in excess of 8 hours a day." *See* Doc. No. 157 at 76. Such a restriction would not prevent him from working field utility for no more than 8 hours a day.

4

classification, or school.  *Id.* at 2.  Placing a sick call does not automatically place an inmate on the lay-in list.  *Id.*  Sick call lists are different than lay-in lists.  *Id.;* Doc. No. 150-3 at 2; Doc. No. 150-4 at 2.  However, Green testified, "[i]t's my understanding when a sick call is placed you're on the lay-in list, and you're laid in for that day until you get through with sick call."  Doc. No. 160 at 40.

Green placed an emergency sick call request on September 14, 2016.  Doc. No. 160 at 26.  Culclager's affidavit describes how sick call requests are handled as follows.  Sick call requests are collected by the night shift and placed in a box for medical.  Doc. No. 150-4 at 1.  A sick call nurse retrieves the sick calls daily.  *Id.*  He or she will review the requests, place the sick calls into a binder, and make a list of names of patients to be seen.  Appointments begin around 9:30 a.m.  Doc. No. 150-3 at 2; Doc. No. 150-4 at 1.  Medical staff and the security officer in the infirmary see inmates that are on the sick-call list that day.  Doc. No. 150-4 at 2.  Medical staff does not create a lay-in list, but may give patients a prescription to be off duty if the medical need is extremely urgent.  *Id.*  If an officer calls for an inmate who is not available because the inmate is working, the nurse will call for that inmate again later in the day, usually during lunch break or in the afternoon.  *Id.*

On September 15, 2016, Green reported for work and asked Sergeant Miller and Lieutenant Burns if he was on the lay-in list for an emergency health request sick call.  Doc. No. 160 at 15.  Green says that Miller did not check but told him he was not, and Burns told him to go to work.  *Id.*  After finishing work, Green was taken to the infirmary because of blisters on his hands.  *Id.* at 15 & 29.  Green claims that Sergeant Cynthia Gaines informed him he was on the lay-in list when he got to the infirmary.  *Id.* at 15-16, 29.  Green testified:

> I said when I went to the infirmary for my hands because they were blistered and bleeding that the infirmary security officer told me I was on the lay-in and that at

5

like 10:25 or 10:30 she called for sick call. She's the one that told me I was on the
lay-in list for that day.  That's how I found out I was on lay-in list was through
infirmary security.

*Id.* at 29.  Gaines was the security officer stationed at the unit's infirmary at that time.  Doc. No.

150-3 at 1.  Gaines' duties at the infirmary were calling inmates for appointments and upholding

security.  *Id.*  Gaines only had access to the sick call lists; she did not have access to the lay-in

lists.  *Id.* at 2.  Gaines could not have told Green that he was on the lay-in list, *id.,* and Green was

not in fact on the lay-in list for September 15, 2016.  Doc. No. 150-1 at 2; Doc. No. 141 at 1.[3]

Regardless, Green was seen twice by medical on September 15, 2016: once for his blisters, and

once for his sick call request.  Doc. No. 160 at 29; Doc. No. 150-3 at 2-3; Doc. No. 150-4 at 2-3.

Green was given a prescription for a seven day lay-in.  Doc. No. 160 at 35.

### September 26, 2016

Green submitted another sick call request on September 24 or 25, 2016.  *Id.* at 43.  On

September 26, 2016, Green reported for work and asked Burns to check the lay-in list.  *Id.* at 16 &

44.  Green says that Burns did not check the list but told Green he was not on it and to get to work.

*Id.* at 16 & 44-45.  Green was not in fact on the lay-in list for September 26, 2016.  Doc. No. 150-

1 at 2; Doc. No. 141 at 1.

Green testified that at the end of his shift on September 26, field riders Sergeants Moore

and Ridgle witnessed him fall down a sloped incline.  Doc. No. 160 at 16 & 21-22.  Green claims

he told Moore he was hurt and needed treatment.  *Id.* at 17.  Green asked Moore for help one time.

*Id.* at 63-64.  Green did not have any contact with Ridgle.  *Id.*  at 64.  Green was not bleeding after

the fall and had no open wounds or ripped clothing.  *Id.* at 62.  Green does not remember yelling

or crying after the fall, but thinks he may have said "ouch."  *Id.* at 55.  Green states he limped after

---

[3] Following an in camera review of relevant lay-in lists, the Court determined that Green was not
listed on lay-in lists for September 9, 12, 13, 14, 15, 16, and 26, 2016.

the fall took place. *Id.* at 56. Green did not tell Moore or Ridgle he was unable to walk. *Id.* at 47-49. Green walked back to the gate on his injured leg. *Id.* at 17. Moore took Green to the infirmary approximately 30 minutes after his fall. Doc. No. 160 at 17, 53-54. Green claims he was not treated for his injuries in the infirmary but was given a prescription for crutches and an Ace wrap later that day. *Id.* at 17-18. Green picked up his crutches the next day. *Id.* at 19.

According to Culclager's affidavit, if an inmate is injured while working in the field, he is to notify his immediate supervisors. Doc. No. 150-1 at 2. The field rider will determine if the injury requires immediate medical attention. *Id.* If the field rider determines the injury warrants immediate medical attention, the field rider is to notify his supervisor. *Id.* If needed, the supervisor will bring a truck out to transport the inmate back to the infirmary. *Id.* at 3.

### *Chow Hall*

It is the policy of the Tucker Maximum Security Unit that inmates who require walking-assistance devices, such as canes or crutches, are not permitted to possess these devices while eating. Doc. No. 150-1 at 3. Because canes and crutches are easily used as weapons should a fight break out, they pose a security threat if allowed to remain in the chow hall. *Id.* Per policy, inmates who require walking-assistance devices may use such devices to get seated at a table at the chow hall. *Id.* Once the inmate is seated, staff will remove the walking device and place it in the control booth. *Id.* An inmate porter or staff member will bring the inmate a tray of food. *Id.* Once the inmate is finished eating, he can indicate to the guards he is finished, and his walking-assistance device will be returned to him so he can safely return to the barracks. *Id.*

On September 27, 2016, Green was allowed to use his crutches to get to his table. Doc. No. 160 at 66-67. Green testified that after he sat down, he saw Captain Davis look into the chow hall and say something to Lieutenant Clark. *Id.* at 19. Clark then removed Green's crutches and

7

placed them in the control booth. *Id.* Green did not hear Davis say anything to Clark regarding his crutches, and Davis did not remove his crutches. *Id.* at 77. Green did not notify Clark or Davis when he was done eating but claims they could see he was done eating and did not bring the crutches to him. *Id.* at 67, 76. Green did not ask Clark or Davis to return his crutches. *Id.* at 73 & 76. Green walked to the control booth to retrieve his crutches. *Id.* at 67.

## IV. Analysis

Defendants argue they are entitled to qualified immunity with respect to Green's individual capacity claims. Qualified immunity protects government officials from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity is a question of law and is appropriately resolved on summary judgment. *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions: (1) do the facts alleged by plaintiff establish a violation of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct. *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015). Courts may exercise "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

To prevail on an Eighth Amendment claim of deliberate indifference to serious medical needs, Green "must prove that he suffered from one or more objectively serious medical needs, and that prison officials actually knew of but deliberately disregarded those needs." *Roberson v. Bradshaw*, 198 F.3d 645, 647 (8th Cir. 1999). An objectively serious medical need is one that is

"either obvious to the lay person or supported by medical evidence, like a physician's diagnosis." *Roberson*, 198 F.3d at 648 (quotation omitted). "Deliberate indifference is 'akin to criminal recklessness,' something more than mere negligence; a plaintiff must show that a prison official 'actually knew that the inmate faced a substantial risk of serious harm' and did not respond reasonably to that risk." *A.H. v. St. Louis Cty., Missouri*, 891 F.3d 721, 726 (8th Cir. 2018) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006); *Farmer v. Brennan*, 511 U.S. 825, 836–37, 844–45 (1994)).

The undisputed facts establish that defendants were not deliberately indifferent to Green's serious medical needs. Defendants Burns and Miller cannot be held liable for requiring Green to work on a day he was not on a lay-in list. Defendants have offered proof establishing that Green was not in fact on the lay-in list on September 15 or September 26. Green's deposition testimony shows that he believed he would be on the lay-in list on these days because he had submitted a sick call request beforehand. However, defendants have provided unrefuted evidence that an inmate's placing a sick call request does not automatically result in the inmate being placed on the lay-in list; that sick call lists and lay-in lists are not the same; and that inmates who are working may be seen for sick call during their lunch break or after they finish with work. Additionally, because infirmary security did not have access to the lay-in list, Sergeant Gaines could not have told Green he was on a lay-in list as he alleges. And significantly, Green does not claim that he told Burns and Miller he was hurt and could not work, and he provides no evidence to show that Burns or Miller had any reason to believe Green should not be required to work on either September 15 or September 26, 2016.

With respect to Green's fall on September 26, the undisputed facts establish that defendants Moore and Ridgle were not deliberately indifferent to Green's serious medical needs. Green

completed his work shift and fell as the inmates were being called to line up at the end of the shift. Green claims that Moore and Ridgle saw him fall. He admits he had no further contact with Ridgle, and he claims he only told Moore he was hurt once. While Green claims he walked with a limp after the fall, he admits he was not bleeding and had no open wounds or rips in his clothing. He also admits he did not yell or cry out in pain but may have said "ouch." Green's actions following his fall were not sufficient to put Moore or Ridgle on notice that Green was suffering a severe enough injury to require assistance with walking or a ride to the infirmary. Further, Moore took Green to the infirmary approximately 30 minutes after returning from work. Green has offered no evidence that walking back to the unit exacerbated his injuries.

Finally, the undisputed facts establish that neither Clark nor Davis was deliberately indifferent to Green's medical needs during chow hall on September 27, 2016. Defendants produced declarations from prison officials explaining that it is the policy at Tucker Maximum Security Unit not to allow prisoners to keep their crutches at the table during chow hall for security reasons. Green acknowledges he was allowed to use his crutches to be seated and that he did not attempt to get Clark, Davis, or anyone else's attention when he finished eating to get his crutches back. He merely expected they would see that he had finished eating and bring his crutches back to him. He did not ask for help before walking to the control booth to get his crutches. These facts are insufficient to show that Clark or Davis were deliberately indifferent to Green's need to have his crutches back. Additionally, Green has produced no evidence to show that walking to the control booth to obtain his crutches worsened his condition. Because a § 1983 action is a type of tort claim, general principles of tort law require that a plaintiff suffer some actual injury before he can receive compensation. *See Irving v. Dormire*, 519 F.3d 441, 448 (8th Cir. 2008) (citing *Carey v. Piphus*, 435 U.S. 247, 253-55 (1978)). *See also* 42 U.S.C. § 1997e(e) (requiring a prisoner to

show an actual physical injury as opposed to mental or emotional injury to sustain a claim for compensatory damages).

### IV.  Conclusion

For the reasons described herein, the undersigned recommends that defendants' motion for summary judgment (Doc. No. 150) be granted.  Defendants are entitled to qualified immunity on Green's individual capacity claims because the undisputed material facts show that they were not deliberately indifferent to Green's serious medical needs.  Green's claims should be dismissed with prejudice.

DATED this 13th day of March, 2019.

_____
UNITED STATES MAGISTRATE JUDGE